UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
NEW SOUTH INSURANCE COMPANY,                    :
:
Plaintiff,              :
:                        20 Civ. 4087 (JPC)
-v-                     :
:                        OPINION
CAPITAL CITY MOVERS LLC, *et al.*,              :                        AND ORDER
:
Defendants.             :
:
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff New South Insurance Company ("New South") seeks a declaratory judgment clarifying its legal obligations arising from an April 2019 automobile accident (the "Accident") involving a vehicle (the "Vehicle") owned and operated by Defendant Capital City Movers ("Capital City"). New South has brought this action against Defendant David Brown, who was seriously injured during the Accident when he was struck while riding his bicycle, as well as against Capital City and a number of other entities and individuals associated with it. Capital City and its associated entities and individuals (collectively, the "Defaulting Defendants") have failed to appear in this action. Both New South and Brown now move for summary judgment, each seeking a declaration determining the amount of insurance coverage that New South owes to Capital City for liability for injuries arising from the Accident. New South further moves for summary judgment, seeking a declaration that it has no duty to provide a defense in any personal injury action seeking compensation from the Defaulting Defendant for injuries suffered in the

Accident.[1]  For the following reasons, New South's motion is granted, and Brown's motion is denied.

## I. Background

### A.  Facts[2]

The parties dispute only their legal obligations, not the facts that give rise to those obligations, and thus they have jointly stipulated to the material facts in this action.  *See* 56.1 Stmt. at 1; Dkt. 69 ("Pl. Mem.") at 2; Dkt. 71 ("Deft. Mem.") at 2 n.1.  The Accident occurred on April 30, 2019.  56.1 Stmt. ¶ 4.  On that day, Capital City had been contracted to move property between two residential addresses in lower Manhattan.  *Id.* ¶ 11; *id.* Exh. G.  While Brown was riding his bicycle on the Hudson River Greenway in lower Manhattan, he was struck and seriously injured by the Vehicle, a 2011 International Box Truck with vehicle identification number ("VIN") 1HTJTSKL9BH376279.  *Id.* ¶ 4.  The Vehicle was owned by Capital City from 2017 through the Accident, *id.* ¶ 6; *id.* Exh. E (the "Vehicle Title"), and at the time of the Accident it was being operated by Defendant Nikola Radunovic on behalf of Capital City, *id.* ¶ 10.  Following the Accident, Brown filed three state court actions seeking compensation for his injuries.  *Id.* ¶ 12.  One of those actions was filed against four of the five Defaulting Defendants, and another was filed against the City of New York; those two actions have since been consolidated and amended to add the fifth Defaulting Defendant as a defendant (the "State Court Action").  *Id.* ¶¶ 12-13.  New

---

[1] In addition, New South has moved for default judgment against the Defaulting Defendants, which the Court will separately resolve.

[2] The following facts are drawn primarily from the parties' joint stipulation of material facts, submitted pursuant to Local Rule 56.1, and the exhibits appended thereto.  Dkts. 70, 72 ("56.1 Stmt.").

South is providing the defenses for the Defaulting Defendants in the State Court Action. Pl. Mem. at 7. Brown's third action was filed against the State of New York. 56.1 Stmt. ¶ 12.

New South is an insurance company authorized to issue insurance policies in the State of New York. Dkt. 1 ("Complaint") ¶ 1. It issued a New York commercial vehicle insurance policy (the "Policy") to Capital City, which was in effect from September 19, 2018 to September 19, 2019. 56.1 Stmt. ¶ 14. When initially issued, the policy declarations listed three insured vehicles, including a 2011 International Box Truck with VIN number 1HTJTSKL9BH376279, *i.e.*, the Vehicle. *Id.*; *id.* Exh. I ("Sept. 19 Declarations") at 2. Pursuant to those declarations, for each of the three insured vehicles the Policy provided coverage for liability for bodily injury up to $25,000 per person. 56.1 Stmt. ¶ 14; Sept. 19 Declarations at 2-3. Subsequently, on December 13, 2018, the Policy was amended, removing the Vehicle from the list of insured vehicles, and increasing the policy limit for bodily injury liability up to $100,000 per person for the two remaining insured vehicles listed on the declarations. 56.1 Stmt. ¶ 15; *id.* Exh. J at 2-3. On February 22, 2019, the Policy was amended once again. 56.1 Stmt. ¶ 17. Although the schedule of insured vehicles remained unchanged, the policy limits were changed from split limit coverage (which provides separate coverage limits for (1) personal injury to any one individual, (2) total personal injuries, and (3) property damage) to combined single limit coverage (which simply limits the total coverage for all liability resulting from an accident) in the amount of $750,000 for each of the insured vehicles. *Id.*; *id.* Exh. L at 2-3. Then, on March 5, 2019, the Policy was amended once again to remove one vehicle from the list of insured vehicles and to change the policy limits for the lone remaining insured vehicle from a combined single limit of $750,000 to split limits providing, among other forms of coverage, personal injury coverage up to $100,000 per person. 56.1 Stmt. ¶ 19; *id.* Exh. N at 2. Finally, on April 2, 2019, the Policy was amended one final time

3

to once again list two insured vehicles, neither of which was the Vehicle, with combined single limit coverage of $750,000 for each.  56.1 Stmt. ¶¶ 21-22; *id.* Exh. P ("4/2/2019 Policy") at 3-4. At the time of the Accident on April 30, 2019, this version of the Policy was in effect.  56.1 Stmt. ¶ 21.

New York law requires "[e]very common and contract motor carrier of property" that does not qualify as a self-insurer to "secure and maintain and file with the commissioner a surety bond or certificate of a company authorized to do business in this State by the Superintendent of Insurance . . . covering each motor vehicle so to be operated for the sum hereinafter set forth." N.Y. Comp. Codes R. & Regs. tit. 17, § 855.1 (2022).  That section then sets forth "[f]or personal injury or death to one person" the sum of "$100,000."  *Id.*  New York law further requires "[c]ertificates of insurance [to] be in accordance with the forms set forth in Appendix B-7 of this Title."  *Id.* § 855.4(e).  Appendix B-7 to Title 17 of the New York Compilation of Codes, Rules, and Regulations sets forth the "FORM E UNIFORM CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY CERTIFICATE OF INSURANCE" ("Form E").  *Id.* app. B-7.  Form E certifies that an insurer has issued to a motor carrier a policy or policies of insurance "which, by attachment of the Uniform Motor Carrier Bodily Injury and Property Damage Liability Insurance Endorsement, has or have been amended to provide automobile bodily injury and property damage liability insurance covering the obligations imposed upon such motor carrier by the provisions of the motor carrier law of the State in which the Commission has jurisdiction or regulations promulgated in accordance therewith."  *Id.*

When a certificate is filed in accordance with Form E, furthermore, "there shall be attached to the original policy of insurance, an endorsement in the form set forth in Appendix B-7 of this Title, infra, and marked 'Form F--Uniform Motor Carrier Bodily Injury and Property Damage

4

Liability Insurance Endorsement.'"   *Id.* § 855.4(f)*.*  Appendix B-7 then sets forth the "FORM F

UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY

INSURANCE ENDORSEMENT" ("Form F"), which records an agreement that:

> [t]he certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission laying jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby, provided only that the insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except by reason of the obligation assumed in making such certification.

*Id.* app. B-7.  Thus, under New York law, every contract motor carrier of property that purchases

insurance (rather than self-insuring or purchasing a surety bond) must, by filing a Form E, certify

that a Form F has been attached to its insurance policy.

Based on its contractual agreements with Capital City, New South made a series of

certifications to the New York State Department of Transportation ("Department of

Transportation").  First, on or about December 14, 2018, New South filed a Form E with the

Department of Transportation certifying that the Policy had been issued to Capital City  and

specifying that it provided liability coverage for bodily injury up to $100,000 per individual and

$300,000 total and for property damage up to $50,000.  56.1 Stmt. ¶ 16; *id.* Exh. K ("12/14/2018

Form E") at 1.  Subsequently, on or about February 25, 2019, New South filed a Form E with the

Department of Transportation certifying that the Policy, issued to the same insured, provided

coverage up to a combined single limit of $750,000.  56.1 Stmt. ¶ 18; *id.* Exh. M ("2/25/2019 Form

E").  Then, on or about March 7, 2019, New South filed a Form E with the Department of

Transportation certifying that the Policy, issued to the same insured, provided liability coverage

for bodily injury up to $100,000 per individual and $300,000 total and for property damage up to

$50,000. 56.1 Stmt. ¶ 20; *id.* Exh. O ("3/7/2019 Form E"). Although as mentioned the Policy was amended once more on April 2, 2019, New South never filed an updated Form E reflecting the revised coverage limits established by that amendment.

## B. Procedural History

On May 28, 2020, New South filed the Complaint that initiated this action. The Complaint requests a declaratory judgment determining what rights and obligations the Policy imposes on New South as a result of the Accident, with respect to both its liability for claims arising out of the Accident and its duty to defend in any personal injury action seeking compensation for injuries suffered as a result of the Accident.[3]  Complaint at 10-11. Brown answered the Complaint on August 3, 2020. Dkt. 26 ("Answer"). Thanks to information uncovered over the course of fact discovery, New South and Brown were able to considerably narrow the scope of their legal dispute. Presently, the "single question of law dispositive of the remaining legal issues" between New South and Brown is:

> What is the applicable limit of coverage available to Capital City for the relevant motor vehicle accident following New South's filing with the New York State Department of Transportation of a Form E--Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance for the benefit of Capital City?

Dkt. 57 at 2. The Defaulting Defendants—*i.e.*, every Defendant other than Brown—have not answered the Complaint or otherwise appeared in this action. The Clerk of Court issued a certificate of default with respect to each Defaulting Defendant on July 1, 2021. Dkts. 47-51.

---

[3] As the Supreme Court held in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941), if the insured under an insurance policy is sued for damages caused in an accident, the Declaratory Judgment Act, 22 U.S.C. § 2201, grants a federal court the power to issue a declaratory judgment determining the obligations that policy imposes on the insurer with respect both to the insured and to the individuals injured in that accident. *Md. Cas. Co.*, 312 U.S. at 274.

6

On January 28, 2022, Brown filed a motion for summary judgment, Dkt. 63, and New South filed a motion for summary judgment as to Brown and for default judgment as to the Defaulting Defendants, Dkt. 66.  New South's motion seeks three declarations.  Pl. Mem. at 24-25.  First, New South asks the Court to declare that it has no obligation to defend and/or indemnify any Defendant under the Policy with regard to the Accident and any claims arising from it, including the State Court Action.  *Id.*  Second, New South asks the Court to declare that the Forms E and F pertaining to the Policy make Capital City eligible only for $100,000 worth of insurance coverage for liability arising from the Accident, the minimum required by regulation.  *Id.* at 25.  Third, New South asks the Court to declare that it may withdraw from the defense that it is currently providing the Defaulting Defendants in the State Court Action.  *Id.*  Brown's motion, in turn, asks the Court instead to declare that Capital City's insurance coverage for liability arising from the Accident extends up to the maximum amount provided by the Policy, a combined single limit of $750,000.  Deft. Mem. at 21-22.  On February 28, 2022, each appearing party opposed the other's motion for summary judgment.  Dkts. 75 ("Pl. Opp."), 74 ("Deft. Opp.").  New South's Opposition reiterated its requested declarations.  Pl. Opp. at 17.  Brown opposed New South's requested declarations that Capital City's insurance coverage for the Accident extends only up to $100,000 for personal injury to any one person and that New South has no duty to defend the Defaulting Defendants in the State Court Action.  Deft. Opp. at 4-9.  On March 7, 2022, New South and Brown each replied to the other's opposition.  Dkts. 78, 79.

## II. Standard of Review

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  New South and Brown do not dispute any matter of fact; instead, they have jointly stipulated to the facts that they

believe to be material to this action.  *See generally* 56.1 Stmt.  On the basis of those undisputed facts, then, the Court must determine whether either party is entitled to judgment as a matter of law.

### III. Discussion

In their summary judgment briefs, the parties dispute two questions of law: (1) the limits of Capital City's insurance coverage for liability arising from the Accident and (2) whether New South has a duty to defend Capital City and the other Defaulting Defendants in the State Court Action and any other similar action.  The Court addresses each issue in turn.

### A.  Capital City's Coverage Limits

New South provided insurance coverage to Capital City under the Policy.  *See generally* 4/2/2019 Policy.  In addition, at the time of the Accident, New South had certified to the Department of Transportation that the Policy "has . . . been amended to provide automobile bodily injury and property damage liability insurance covering the obligations imposed upon such motor carrier by the provisions of the motor carrier law" of New York State.  3/7/2019 Form E.  New South and Brown agree that these documents together provide Capital City with insurance coverage for liability arising from the Accident.  Pl. Mem. at 15-16; Deft. Opp. at 4.  They disagree, however, about the amount of coverage those documents together provide.  For the following reasons, the Court agrees with New South's contention that Capital City is entitled to coverage only up to $100,000 for liability for personal injury to one person arising from the Accident.

### 1.  Coverage Under the Policy, Form E, and Form F

Under the Policy, New South was obligated to "settle or defend . . . any claim or suit asking for damages . . . because of **bodily injury** . . . arising out of the ownership, maintenance or use of **your insured auto**."  4/2/2019 Policy at 17.  The Policy defines "your insured auto," in turn, as

8

a.   Any **auto** described in the Declarations and any **auto you** replace it with.

b.   Any additional **auto** which **you** acquire during the Policy period provided we already insure all **autos** that **you** own.

c.   Any **auto** not owned by **you** while **you** are temporarily driving it as a substitute for any other **auto** described in this definition because of its withdrawal from normal use due to breakdown, repair, servicing, **loss**, or destruction.

*Id.* The Vehicle, the 2011 International Box Truck involved in the Accident, was not described in the declarations of the Policy as of the time of the Accident. *Id.* at 3-4. Furthermore, because Capital City had owned the Vehicle since November 9, 2017, *see* Vehicle Title at 1, the Vehicle was not acquired by Capital City during the Policy period, which began on September 19, 2018, *see* 4/2/2019 Policy at 3, and it was not being driven temporarily as a substitute for any other automobile. Thus, the Vehicle does not fit within the definition of "your insured auto" under the Policy, and, as both New South and Brown agree, New South's promise in the Policy to defend or settle claims for liability for personal injury arising from the use of "your insured auto," *see id.* at 17, does not entitle Capital City to coverage for liability arising from accidents caused by the Vehicle. *See* Pl. Mem. at 11; Deft. Opp. at 4.

Nonetheless, merely because the Vehicle did not fall within the Policy's definition of "your insured auto" on April 30, 2019, it does not follow that Capital City is not entitled to coverage for liability arising from the Accident. New York regulations ensure that insurance will be available to compensate accident victims even if their claims are excluded by the terms of the injurer's insurance policy. By filing a Form E with the Department of Transportation, New South certified that the Policy had been amended, "by attachment of [Form F], . . . to provide automobile bodily injury . . . liability insurance covering the obligations imposed upon such motor carrier by the provisions of" New York laws and regulations governing motor carriers. 3/7/2019 Form E; *see* N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7. Similarly, under Form F, the "certification of the

9

policy . . . amends the policy to provide insurance for automobile bodily injury . . . liability in accordance with the provisions of [State motor carrier] law or regulations to the extent of the coverage and limits of liability required thereby." N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7. And New York's regulations governing "[c]ommon and contract motor carriers" provide that each such carrier not qualified to self-insure must secure and maintain and file an insurance certificate or surety bond "covering each motor vehicle so to be operated for the sum hereinafter set forth, conditioned for the payment of all judgments recovered against such motor carrier," following which the sum of "$100,000" is set forth "[f]or personal injury or death to one person." *Id.* § 855.1.

Although the terms of the Policy in effect at the time of the Accident did not themselves cover liability arising from personal injury caused by the Vehicle, Forms E and F together amended the Policy to provide coverage for liability arising from personal injury caused by the Vehicle.[4] First, the Vehicle clearly was "so to be operated"—that is, operated "transporting property for compensation," *id.*—since Capital City used the Vehicle to transport property for compensation and was using it for that purpose on at the time of the Accident. 56.1 Stmt. ¶¶ 10-11; *id.* Exh. F at 67-69. Thus, New York regulations governing motor carriers required Capital City to maintain personal injury liability insurance covering the Vehicle. N.Y. Comp. Codes R. & Regs. tit. 17, § 855.1. By filing a Form E with the Department of Transportation, New South certified that the

---

[4] Form F speaks of providing "insurance." N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7. Strictly speaking, though, an amendment pursuant to Forms E and F does not provide insurance coverage for liabilities that do not fall within the terms of a policy but rather makes the insurer a surety for such liabilities, since Form F requires "the insured . . . to reimburse the [insurer] for any payment made by the [insurer] which it would not have been obligated to make under the terms of the policy except by reason of the obligation assumed in [a Form E] certification." *Id. See generally Real Legacy Assur. Co. v. Santori Trucking, Inc.*, 560 F. Supp. 2d 143, 146-48 (D.P.R. 2008) (explaining why Form MCS-90, the federal analogue of Form F, is effectively an agreement to serve as a surety rather than to provide insurance). Nonetheless, this technical distinction is not relevant to the dispute between the parties in this case.

Policy had been "amended to provide automobile bodily injury . . . liability insurance covering the obligations imposed upon" Capital City by New York laws and regulations governing motor carriers.  Similarly, Form F, which was certified to have been attached to the Policy, provides that when the Policy was certified by filing a Form E, the Policy was thereby amended "to provide insurance for automobile bodily injury . . . liability in accordance with the provisions of [State motor carrier] law or regulations to the extent of the coverage and limits of liability required thereby."  Forms E and F thereby jointly amended the Policy to provide whatever automobile bodily injury liability insurance Capital City was required to maintain by New York motor carrier laws and regulations.  And New York motor carrier laws and regulations required Capital City to maintain insurance covering liability for personal injury arising from the use of the Vehicle.  Thus, as New South and Brown agree, under the Policy as amended by Forms E and F, Capital City is entitled to some amount of coverage for liability it faces for personal injury arising out of the Accident.  Pl. Mem. at 16; Deft. Mem. at 12.

### 2.  Coverage Limits Pursuant to Amendment Through Forms E and F

New South and Brown disagree, however, about the extent of coverage to which Capital City is entitled.  At the time of the Accident, the Policy provided Capital City with coverage for liability arising from the use of its insured vehicles up to a combined single limit of $750,000. Brown argues that this combined single limit applies to all of Capital City's vehicles insured under the Policy, whether they are insured under the terms of the Policy itself or only pursuant to the Policy as amended through Forms E and F.  Deft. Mem. at 19-20.  By contrast, New South argues that vehicles covered under the terms of the Policy itself are insured up to the limits set forth in the Policy, but vehicles covered only pursuant to amendment through Forms E and F are covered only up to the minimum amount of insurance coverage required by New York regulations.  Pl.

Mem. at 25.  This is a question of New York law, but neither the parties nor the Court have identified a decision of the New York Court of Appeals that addresses it.  "Absent law from a state's highest court, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law."  *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000).  And to "predict how the highest court of the state would resolve the uncertainty" in state law, the court must "consider[] all of the resources to which the highest court of the state could look."  *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 470 (2d Cir. 2018) (internal quotation marks omitted).

In the Court's view, similar reasoning that compels the conclusion that the Vehicle is covered under the Policy as amended through Forms E and F, *see supra* III.A.1., also reveals that Capital City's liability coverage arising from the use of the Vehicle extends only up to the minimum insurance coverage required by regulation.  As explained above, Capital City is entitled to insurance coverage for liability arising from the use of the Vehicle because Forms E and F amended the Policy to bring Capital City in compliance with New York motor carrier laws and regulations, and those regulations required Capital City to maintain insurance that covered all vehicles used to transport property for compensation.  But just as New York motor carrier regulations specify that motor carriers must maintain and file a certificate of insurance covering all vehicles used to transport property for compensation, so too do those regulations specify the amount of coverage that motor carriers must maintain.  In particular, motor carriers must "secure and maintain and file" a certificate of insurance "covering each motor vehicle so to be operated *for the sum hereinafter set forth*," after which the sum of "$100,000" is set forth "[f]or personal injury or death to one person."  N.Y. Comp. Codes R. & Regs. tit. 17, § 855.1 (emphasis added).  Forms E and F amended the Policy to bring Capital City in compliance with its obligations under

12

New York motor carrier laws and regulations, and those regulations required it to maintain insurance of $100,000 for personal injury or death to one person covering each vehicle used to transport property for compensation.  Since the Policy did not under its own terms cover liability arising from the use of the Vehicle, notwithstanding state regulations requiring Capital City to maintain such coverage, Forms E and F amended the Policy to provide that coverage.  And since those regulations required Capital City's insurance coverage to extend only up to $100,000 for personal injury or death to one person, Forms E and F accordingly amended the Policy to provide coverage only up to $100,000 for liability for personal injury or death to one person arising from the use of the Vehicle.  In short, Capital City's coverage for liability for personal injury caused by the use of the Vehicle arises from a provision amending the Policy to comply with state laws and regulations, and therefore the extent of that coverage is limited to the minimum coverage legally required.

Furthermore, the texts of both Forms E and F plainly confirm that insurance coverage arising only from an amendment through those forms is limited to the minimum coverage required by law.  First, Form F provides that "[t]he certification of the policy . . . amends the policy to provide insurance for automobile bodily injury . . . liability in accordance with the provisions of [State motor carrier] law or regulations *to the extent of the coverage and limits of liability required thereby*."  N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7 (emphasis added).  Thus, Form F explicitly provides that Forms E and F amend a policy only to provide insurance for bodily injury liability up to the "limits of liability required" by New York regulations, which at the time of the Accident required insurance up to $100,000.  *See id.* § 855.1.  Similarly, Form E explicitly certifies that the policy issued to the motor carrier named on the certificate has "been amended to provide automobile bodily injury . . . liability insurance covering *the obligations imposed upon such motor*

*carrier* by the provisions of the motor carrier law of [New York] State . . . or regulations promulgated in accordance therewith." *Id.* app. B-7 (emphasis added); *see also* 3/7/2019 Form E. And again, at the time of the Accident New York regulations obliged motor carriers to secure and maintain insurance "covering each motor vehicle so to be operated for the sum hereinafter set forth," including, "[f]or personal injury or death to one person, $100,000." *Id.* § 855.1. Form E thus certifies that the Policy has been amended to provide insurance covering the obligations imposed on a motor carrier by New York motor carrier law and regulations, and those regulations imposed on motor carriers the obligation to maintain $100,000 worth of insurance to cover liability for personal injury to one person. Thus, an amendment effected by Forms E and F provides $100,000 worth of insurance to cover liability for personal injury to one person.

Finally, while there is only limited New York authority interpreting coverage limits under Forms E and F, as discussed *infra* III.A.3.b., the relatively few courts in other jurisdictions to have explicitly considered the question have agreed with the Court's conclusions as to the extent of insurance available for liability arising from the use of a vehicle that is excluded from the terms of an insurance policy and thus insured only under an amendment through Forms E and F. Appellate courts in Georgia and Illinois have heard cases in which the parties explicitly disputed whether, if insurance coverage exists only because a motor carrier's insurance policy was amended by Forms E and F, that coverage is limited to the minimum required by law or instead extends to the limits of coverage under the actual terms of the policy. *See Ross v. Stephens*, 496 S.E.2d 705 (Ga. 1998); *Guar. Nat. Ins. Co. v. Koch*, 611 N.E.2d 91 (Ill. App. Ct. 1993). And in each case, the court found that if insurance coverage exists not under the actual terms of a policy but rather only because a policy was amended through Forms E and F, then that coverage extends only up to the minimum coverage required by regulation, not up to the amount of coverage the policy provides for liability

14

covered under the terms of the policy.  *Ross*, 496 S.E.2d at 708 ("The [Form F] endorsement went

on to limit [the insurer]'s liability regarding coverage for the unidentified vehicles to that which

was required by the [Public Service Commission] regulation."); *Koch*, 611 N.E.2d at 93-94 ("The

general rule is that an insurer's liability for an accident for which a statute requires coverage, but

the policy does not provide coverage, is limited to the amount of coverage required by the statute.

. . .  We hold that the form E certificate and form F endorsement . . . amended the policy to provide

liability coverage up to the statutory and regulatory limits for accidents occurring outside of the

50-mile radius.").  For the reasons discussed above, this Court likewise concludes that Capital

City's insurance coverage for liability arising from the Accident extends only to the regulatory

minimum, which is $100,000 for bodily injury to one person.

### 3.  Brown's Counterarguments

Brown advances a number of arguments for why Capital City's entitlement to insurance

should not be limited to New York's regulatory minimum, but rather should extend further to the

coverage limits the Policy provides for liability for use of vehicles described under the Policy's

actual terms.  None of these arguments can overcome the text and structure of the relevant state

motor carrier laws and regulations and Forms E and F, which, as the Court has explained, clearly

indicate that if insurance coverage exists only pursuant to a policy's amendment through Forms E

and F, not under the actual terms of that policy, then the amount of coverage extends only up to

the regulatory or statutory minimum.

#### a.  Form E

Brown first disputes the textual analysis the Court has adopted herein, arguing instead that

a "common sense reading of the Form E Certificate of Insurance" shows "that New South is liable

for the $750,000 Combined Single Limit."  Deft. Mem. at 12-13.  In particular, Brown notes, the

Form Es that New South filed on behalf of Capital City each stated the limits of coverage provided by the Policy at that time.  *See* 12/14/2018 Form E; 2/25/2019 Form E; 3/7/2019 Form E.  And the inclusion of the policy limit on the Form E, Brown argues, indicates that coverage provided by the Policy as amended through Forms E and F always extended up to those policy limits, since there could be no reason to include those limits on the form other than to "alert the NYSDOT and the public of the policy limits and the amount of insurance available to an injured member of the public making a claim under the Form E Certificate of Insurance."  Deft. Mem. at 15.

This argument, however, fails to persuade.  First, while the Form Es New South filed did state limits of coverage under the Policy, Brown has not identified any provision of New York law that requires a filed Form E to state those limits.  Indeed, New York regulations include a blank Form E to be used as a template that does not include any space for the policy limits to be written. N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7.  Nor does Brown offer any argument for why an insurer's own decision to state the policy limits on the form would alter the policy's plain terms or its legal effects, particularly since the form did not further represent that insurance up to that amount existed to cover liabilities that were insured only through the policy's amendment by Forms E and F and not by the actual terms of the policy.  *See, e.g.*, 3/7/2019 Form E.

Second, contrary to Brown's argument, common sense does not dictate that the purpose of including those limits on a Form E must have been to identify the amount of coverage available for liability to an accident victim whose claim would not be covered under the policy terms and thus is covered by the policy only as amended through Forms E and F.  Form E does not only certify that a motor carrier's insurance policy has been amended to cover all obligations imposed by state motor carrier laws and regulations; in addition, Form E is a "certificate of insurance" certifying that the insurer "has issued . . . a policy or policies of insurance" to the motor carrier.

16

N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7.  That is, by filing a Form E on behalf of the insured motor carrier, an insurer certifies that the motor carrier *actually does have insurance*.  Thus, an obvious purpose of stating the policy limits on the form is to identify the amount of insurance available to cover liability to a victim whose claim is covered by that insurance policy according to its actual terms—as many claims are.  Given this clear alternative purpose for mentioning the policy limits, and given that the policy limits written on the form are not mentioned or referred to in the portion of Form E's text certifying that the policy has been amended to cover all obligations imposed by state motor carrier laws and regulations, a common sense reading of Form E would not take that amendment to provide coverage up to the policy limits written on Form E.

### b.  New York Caselaw

Next, Brown urges the Court to rely on a decision of a New York state trial court as a basis for finding Capital City's insurance coverage to extend to the limits imposed by the Policy, not merely to the minimum required by regulation.  Deft. Mem. at 13-15.  In particular, Brown urges this Court to follow *Gish v. Allstate Insurance Co*., 654 N.Y.S.2d 558 (Sup. Ct. 1997), *rev'd on other grounds*, 668 N.Y.S.2d 942 (App. Div. 1998), in which New York Supreme Court, Queens County, required the defendant insurance company to cover its insured's liability up to the policy limits even though the plaintiff's claim was covered not under the policy's terms but rather only pursuant to the amendment of the policy through Forms E and F.  *Id.* at 560.  Certainly, "[i]n predicting how a state's highest court would rule on an issue, it is helpful to consider the decisions of the state's trial . . . courts."  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 399 (2d Cir. 2001).  But for two reasons, *Gish* provides a particularly poor basis upon which to predict how the New York Court of Appeals would resolve the present case.

17

First, *Gish* is one of two New York cases, both decided in Supreme Court, Queens County, that address the amount of insurance available for liabilities that are covered not under a policy's actual terms, but rather only under the policy as amended through Forms E and F. And in the other case, *American National Fire Insurance Co. v. Levy*, 594 N.Y.S.2d 118 (Sup. Ct. 1992), the court reached the exact opposite conclusion, determining that only the minimum amount of insurance required by regulation was available for liabilities that were excluded from an insurance policy's terms and covered under that policy by virtue of amendment through Forms E and F. *Id.* at 121. Neither the parties nor the Court have identified any additional New York case considering the amount of insurance coverage provided pursuant to an amendment through Forms E and F. Thus, because *Gish* and *Levy* disagree with one another, the decisions of the lower New York courts taken as a whole do not provide a firm basis upon which to make any prediction concerning how the New York Court of Appeals would analyze the legal effects of Forms E and F.

Second, and more importantly, neither *Gish* nor *Levy* squarely considered the question of the extent of coverage available under Forms E and F. In each of those cases, a vehicle operated by a motor carrier but neither owned by the carrier nor listed on its insurance policy was involved in an accident. *Gish*, 654 N.Y.S.2d at 559; *Levy*, 594 N.Y.S.2d at 119. Each insurance company argued, for different reasons, that it had no obligation to cover the motor carrier's liability arising from the accident. *Gish*, 654 N.Y.S.2d at 559; *Levy*, 594 N.Y.S.2d at 119. Thus, the core dispute in each case concerned the existence of insurance coverage, not its extent. To be sure, because in each case the court did find that the insurer was obligated to cover its insured's liability, *Gish*, 654 N.Y.S.2d at 559-60; *Levy*, 594 N.Y.S.2d at 120-21, the court was forced to determine the amount of coverage owed in order to fully resolve the dispute between the parties. But although the courts reached different conclusions about the amount of insurance coverage available, neither appeared

18

to recognize that a threshold question might exist as to how much coverage was available.  Neither, that is, noted the possibility of two theories of the extent of coverage, and thus neither gave any argument or analysis showing why its own position was correct.  Instead, once the existence of insurance coverage had been established, each court simply stated flatly that the insurer was obligated to provide coverage up to a particular limit—in *Gish*, the policy limit, 654 N.Y.S. at 560, and in *Levy*, the regulatory minimum, 594 N.Y.S.2d at 121.

Because neither *Gish* nor *Levy* conducted any legal analysis to determine the amount of insurance coverage to which an insured is entitled when coverage is provided only pursuant to an amendment through Forms E and F, the Court will not rely on either case.  While "the rulings of New York's intermediate appellate courts are at least of persuasive authority, . . . those of a state trial court are usually not binding precedent upon federal courts."  *Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690, 744 (S.D.N.Y. 2006) (internal quotation marks omitted).  Thus, this Court is not bound by Supreme Court's decision in *Gish*.  Furthermore, while "the judgment of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise, the same is not necessarily true of state trial courts."  *Gillespie v. St. Regis Residence Club, New York Inc.*, 461 F. Supp. 3d 96, 112 n.10 (S.D.N.Y. 2020) (citations, brackets, and internal quotation marks omitted).  And a state trial court decision is a particularly unpersuasive datum as to the likely judgment of the state's high court when its conclusion is not supported by any analysis of state law or application of that law to the facts before it, and where that conclusion differs from one reached by another state trial court. Consequently, the Court concludes that *Gish* does not constitute a reliable basis upon which to predict how the New York Court of Appeals would rule in the present dispute, particularly because

a direct analysis of the New York regulatory provisions and insurance forms relevant to this case, in the Court's view, clearly indicates how the Court of Appeals would interpret those provisions and forms.

### c.  The MCS-90

Next, Brown defends his interpretation of Form F by analogy to Form MCS-90, the insurance policy endorsement that plays a role in federal regulation of interstate motor carriers analogous to the role that Form F plays in state regulation of intrastate motor carriers.  Deft. Mem. at 20-21.  But this analogy is misguided because the text of the Form MCS-90 differs in its relevant portions from the text of the Form F.

As the Court has explained, the attachment of a Form F endorsement amends an insurance policy only to provide coverage in the amount required by regulation because Form F states explicitly that the policy is amended "to provide insurance for automobile bodily injury . . . liability in accordance with the provisions of [State motor carrier] law or regulations *to the extent of the coverage and limits of liability required thereby*."  N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7 (emphasis added).  Form F thus provides insurance only up to the regulatory minimum because it explicitly states that the limit of liability is the limit required by state regulation.  By contrast, Form MCS-90 provides that "the insurer . . . agrees to pay, *within the limits of liability described herein*, any final judgment recovered against the insured."   Federal Motor Carrier Safety Administration, Department of Transportation, OMB No. 2126-0008, *Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980* at 2 (2022) (emphasis added), https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/ 2022-03/FMCSA%20Form%20MCS-90%2005312024_508.pdf (last accessed Sept. 25, 2022).  And Form MCS-90, unlike Form F, does explicitly require the amount of coverage available under

the policy to be identified.  *Id.* at 1.  Thus, there is an argument that insurance coverage provided pursuant to an amendment through Form MCS-90 reaches the policy limits because the form itself describes those policy limits then sets forth an agreement to provide coverage "within the limits of liability described herein."  But since Form F neither identifies the policy limits nor provides that the coverage limits provided through the form are those "described herein," the proper interpretation of Form MCS-90 is simply irrelevant to interpreting Form F and determining the extent of Capital City's coverage for liability arising from the Accident.

### d.  Public Policy

Lastly, Brown argues that various public policy considerations support extending Capital City's coverage up to the limits provided by the Policy for liability covered under the actual terms of the Policy.  As a threshold matter, such policy considerations cannot overcome the Court's plain reading of the text of the relevant New York laws and regulations and of Forms E and F.  But the Court nonetheless notes that none of these policy arguments are convincing.

First, Brown argues that because New York's laws and regulations are "remedial laws," they "should be interpreted in a way that provides the greatest possible protection to the public." Deft. Mem. at 17-19.  The New York Court of Appeals has explained that remedial legislation must be "interpreted broadly to accomplish its goals."  *Kimmel v. New York*, 80 N.E.3d 370, 376-77 (N.Y. 2017) (citation, brackets, and internal quotation marks omitted).  But even assuming that New York's motor carrier laws and regulations are remedial—a proposition that Brown does not cite any New York authority to support—those laws and regulations plainly belie his implicit claim that their goal is to provide "the greatest possible protection" to the public.  Rather, those regulations explicitly provide that motor carriers need not provide more than $100,000 worth of protection—considerably less than the greatest protection possible—to cover liability for personal

injury to one person.  While "limitations should not be read into . . . remedial statutes unless the limitations proposed are clearly expressed," *id.* at 377 (citation, brackets, and internal quotation marks omitted), New York regulations do clearly limit the requirement of mandatory insurance for the benefit of the public to $100,000 for personal injury to one person.  *See* N.Y. Comp. Codes R. & Regs. tit. 17, § 855.1.  And because under New South's preferred interpretation of Forms E and F, Brown would still be able to recover up to $100,000 from Capital City's insurance coverage, that interpretation does accomplish the goal of ensuring protection to the public.

Second, Brown argues that New South's interpretation of Forms E and F would arbitrarily introduce disparities among the amounts recovered by victims injured by vehicles covered under a policy's terms and victims injured by vehicles covered only under the policy as amended by Forms E and F.  Deft. Mem. at 19.  For example, Brown could have recovered up to $750,000 in coverage had he been similarly struck and injured by a Capital City vehicle listed on the declarations of its insurance policy, but because he was struck and injured by the 2011 International Box Truck, which was not listed, he can recover only up to $100,000 under Capital City's insurance.  Allowing such disparities, in his view, hardly produces "a just result."  *Id.*  But such disparities are inevitable in any system that permits but does not require motor carriers to purchase insurance exceeding a minimum level established by regulation.  In fact, on Brown's preferred interpretation, though a victim's recovery would not differ based on which vehicle owned by a single motor carrier injured him, it could still differ based on which motor carrier owned the vehicle that injured him.  And he provides no reason for why disparate recoveries would be any less arbitrary when they are determined not by the identity of a vehicle but rather by the identity of the vehicle's owner.  Thus, because New York's mandatory insurance scheme accepts that different automobile accident victims seeking compensation will benefit from different amounts

of available insurance, requiring only that all victims have available at least $100,000 in coverage, any disparity among victims created by New South's interpretation of Forms E and F does not amount to a compelling reason to reject it.

Brown further argues that New South's interpretation of the forms would "create perverse incentives for both motor carriers and the insurers, all to the detriment of the public." Deft. Mem. 19.  Under New South's interpretation, he claims, "[m]otor carriers with multiple vehicles and coverage limits greater than $100,000 Each Person would be incentivized to list only one vehicle on their insurance policy so that they could pay the lowest possible premium." *Id.*  But a motor carrier already has a strong incentive to list all its vehicles on its insurance policy, because it cannot receive the benefits of insurance coverage for liabilities arising from the use of a vehicle unless it lists that vehicle on its policy and pays the required premiums.  If the vehicle is left off the policy, then the motor carrier will itself ultimately be liable for any injuries arising from the use of that vehicle, since Form F requires the insured "to reimburse the [insurer] for any payment made by the [insurer] which it would not have been obligated to make under the terms of this policy except by reason of the obligation assumed in making [a Form E] certification."  N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7.  And the risk of bearing that liability gives the motor carrier a strong incentive to purchase adequate insurance.  Furthermore, it is unclear how Brown's interpretation would meaningfully improve the motor carrier's incentives.  Brown disputes the obligations of the insurer, not of the motor carrier, and requiring the insurer to bear additional liability—with the risk that the motor carrier ultimately may not be able to provide reimbursement—could have only an extenuated and therefore limited effect on the incentives a motor carrier faces.

In addition, Brown argues that his interpretation of Forms E and F is necessary to "incentivize insurance companies to properly investigate the motor carrier and determine how

many vehicles it owns or operates." Deft. Mem. at 19-20. But even under New South's interpretation, insurers will have an incentive to ensure that an insured motor carrier has purchased insurance for all the vehicles it owns and operates. If a vehicle is not listed on the policy, the insurer must still pay compensation up to the regulatory minimum for injuries arising from the use of that vehicle even though the insurer would not have been paid any premiums in exchange for providing that coverage. The insurer can then only hope to be able to recover reimbursement from the motor carrier. Furthermore, the public, unlike the insurer, arguably has less of an interest in ensuring that the policy lists all vehicles owned and operated by the motor carrier, precisely because the insurer must provide coverage up to the regulatory minimum due to Forms E and F regardless of whether the vehicle is listed on the policy. Thus, a financially responsible party will be available to provide compensation to injured members of the public to a certain amount, regardless of whether a vehicle is listed on the form. The party primarily interested in ensuring that all vehicles are listed on a policy probably is the insurer itself, which likely would prefer to receive premiums in advance of paying compensation rather than paying compensation and taking the risk of seeking reimbursement after the fact from a potentially judgment-proof motor carrier.

To be sure, Brown's interpretation of Forms E and F, unlike New South's, would ensure that financial resources in excess of $100,000 are available to compensate Brown and other victims in his position. There certainly could be a policy criticism that requiring insurers to cover only up to $100,000 of a motor carrier's liability is insufficient to ensure that such victims are adequately compensated. But whatever the merits of those policy arguments may be, New York has implicitly rejected them by setting the minimum amount of required insurance at $100,000 for liability for personal injury to one person. *See* N.Y. Comp. Codes R. & Regs. tit. 17, § 855.1. And this Court is bound to apply New York law.

24

**B.  New South's Duty to Defend**

In addition to disputing the amount of insurance available to Capital City to cover its liabilities arising from the Accident, Brown and New South dispute whether New South is obligated to provide a defense to the Defaulting Defendants in the State Court Action, or in any action seeking compensation for injuries suffered in the Accident.  Pl. Mem. at 17; Deft. Opp. at 9.  Under New York law, "the duty to defend derives . . . from the insurer's own contract with the insured." *Fitzpatrick v. Am. Honda Motor Co.*, 575 N.E.2d 90, 93 (N.Y. 1991) (citation omitted). To determine the scope of New South's duty to defend the Defaulting Defendants, then, the Court must turn to the insurance contract between New South and Capital City.  In that contract, New South agreed to "settle or defend . . . any claim or suit asking for damages . . . because of **bodily injury** and **property damage** caused by **accident** and arising out of the ownership, maintenance or use of **your insured auto**."  4/2/2019 Policy at 16.  Because the Policy contains no other provision in which New South agreed to defend Capital City or any other Defaulting Defendant, New South's duty to defend under the Policy does not extend beyond the scope of that contractual provision.  New South agreed in the Policy only to defend suits seeking damages for bodily injury arising from the use of "your insured auto."  And as discussed, the Vehicle does not fall within the definition of "your insured auto." *See supra* III.A.1.  Thus, the terms of the Policy do not impose on New South a duty to defend the Defaulting Defendants in the State Court Action or in any other action seeking compensation for injuries suffered in the Accident.

Brown nonetheless argues that "the Form F Endorsement triggered a duty to defend."  Deft. Opp. at 9.  Form F imposes no such duty.  By its terms, Form F "amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of [State motor carrier] law or regulations to the extent of the coverage and limits of

25

liability required thereby." N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7.  Thus, Form F amends a policy to provide the insurance coverage required by New York's motor carrier laws and regulations.  But those laws and regulations do not require a motor carrier to purchase insurance that imposes on the insurer a duty to defend in any action seeking damages that would be covered under the insurance policy.  Instead, the insurance mandated by New York regulations must only be "conditioned for the payment of all judgments recovered against such motor carrier."  N.Y. Comp. Codes R. & Regs. tit. 17, § 855.1.  A motor carrier, that is, must possess insurance that is available to pay judgments that a court enters against that carrier.  But an insurance company's duty to defend is a separate obligation that is "broader than its duty to indemnify."  *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006).  Thus, New York's requirement to possess insurance that will pay judgments does not imply a requirement to possess insurance that will provide a defense in the actions in which those judgments are entered.  And since Form F only amended the Policy to provide insurance "in accordance with the provisions of [State motor carrier] law and regulations," N.Y. Comp. Codes R. & Regs. tit. 17, app. B-7, Form F did not create a duty to defend on the part of New South.

Brown cites only a single authority, *Driskell v. Empire Fire & Marine Insurance Co.*, 547 S.E.2d 360 (Ga. App. 2001), in support of the proposition that Form F creates a duty to defend. Deft. Opp. at 9.  But *Driskell* is distinguishable, and those differences are instructive as to why New South, unlike the insurer in *Driskell*, has no duty to defend.  As in this case, the automobile involved in *Driskell* was not listed on the insurance policy declarations.  *Driskell*, 547 S.E.2d at 362.  And the policy in *Driskell*, like Capital City's policy, required the insurer to defend any suit seeking damages for injury caused by "ownership, maintenance or use of a 'covered auto,'" a term defined to exclude automobiles not listed on the policy declarations.  *Id*. at 365.  In *Driskell*,

however, the policy contained another clause "which can be interpreted as imposing a duty on [the insurer] to defend an insured against any suit seeking damages to which the insurance applies." *Id.* And because the insurance policy had been amended through Forms E and F, the insurance did apply to the accident in *Driskell*. *Id.* at 362-63. Thus, the Court of Appeals of Georgia reasoned, this second clause imposed on the insurer a duty to defend against the victim's claims. *Id.* at 365. *Driskell* did not hold, however, that Form F itself imposed a duty to defend; rather, it held that the terms of the contract imposed that duty because the policy imposed a duty to defend an insured against any suit seeking damages to which the insurance applied, and the policy, as amended through Forms E and F, applied to the victims' claims. Brown has identified no analogous clause in Capital City's policy that can be interpreted as imposing a duty on New South to defend "against any suit seeking damages to which the insurance applies." *Id.* Under the reasoning of *Driskell*, then, the scope of New South's duty to defend would be governed by the clause limiting that duty to actions seeking damages for injuries caused by "your insured autos." And since the Vehicle does not fall within the definition of "your insured autos," *see supra* III.A.1., New South has no duty to defend in the State Court Action or in any other action seeking compensation for injuries suffered in the Accident.

### III. Conclusion

For the foregoing reasons, New South's motion is granted, and Brown's motion is denied. The Court has scheduled a hearing on New South's motion for a default judgment as to the Defaulting Defendants on September 28, 2022. Following that hearing, the Court will issue a single judgment setting forth all declaratory relief that is granted.

The Clerk of the Court is respectfully directed to close the motions pending at Docket Numbers 63 and 66.

SO ORDERED.

Dated: September 27, 2022
     New York, New York

                                                JOHN P. CRONAN
                                     United States District Judge